UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

R.M. BACON, LLC, *et al.*,

                          Plaintiffs,

        -against-                                 1:17-CV-0441 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                       Defendants.

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

In this case, the Court is asked to consider the viability of an action stemming from the contamination of groundwater with perfluorooctanoic acid ("PFOA") in the Village of Hoosick Falls, New York. Dkt. No. 24 ("Amended Complaint") ¶¶ 1–6. In the Amended Complaint, plaintiffs R.M. Bacon, LLC ("RM") and Michael Bacon allege that defendants Saint-Gobain Performance Plastics Corp. and Honeywell International Inc. contaminated the Village's groundwater by discharging PFOA from one or more manufacturing facilities they operated within the Village. E.g., id. As a result of this contamination, Plaintiffs allege that property values "experienced a significant decline," id. ¶ 66, which "caused the collapse of [RM's] 30-year old local business," id. ¶ 1, and diminished the value of Bacon's property, id. ¶ 169. Presently before the Court is Defendants' motion to dismiss the Amended Complaint for failure to state a claim. Dkt. Nos. 26 ("Motion"), 26-2 ("Memorandum"). For the reasons that follow, the Motion is granted in part and denied in part.

## II.    BACKGROUND

### A.  Factual Background

The following facts are taken from the allegations in the Amended Complaint, which are assumed to be true when deciding a motion to dismiss for failure to state a claim. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

PFOA is a man-made chemical used, among other things, "to make fabrics water and stain resistant." Am. Compl. ¶¶ 19, 24. Originally manufactured by the 3M Company, PFOA was also "a key component in the manufacturing of Teflon." Id. ¶¶ 20, 23. According to Plaintiffs, "PFOA has been identified as an emerging contaminant of concern," id. ¶ 26, and the U.S. Environmental Protection Agency ("EPA") has "noted that peer-reviewed studies indicate that 'exposure to PFOA over certain levels may result in adverse health effects,'" id. ¶ 30. "PFOA has the potential to be more of a health concern because it can stay in the environment and in the human body for long periods of time." Id. ¶ 27.

New York State has identified a small factory at 14 McCaffrey Street as the primary source of Hoosick Falls's PFOA contamination. Id. ¶ 31. The McCaffrey Street facility began operating in approximately 1955. Id. ¶ 33. AlliedSignal, which later merged with Honeywell, id. ¶ 14, acquired the facility in 1986, id. ¶ 34. In 1997, Honeywell sold the facility to a company called Furon, which sold it to Saint-Gobain in 1999. Id. ¶ 35. Saint-Gobain owns the facility to this day. Id.

Defendants utilized PFOA to manufacture stain resistant fabrics and other products at the McCaffrey Street facility. Id. ¶¶ 36–39. Plaintiffs allege that "Defendants discharged PFOA into the environment through releases into the atmosphere" and by "discharg[ing] wastewater

containing PFOA directly into . . . the soil." Id. ¶¶ 43, 45. Defendants further allege that "[i]t is possible, if not probable, that [D]efendants also followed waste disposal practices that resulted in the discharge or burial of PFOA-ladened waste in the municipal landfill and one or more other locations around the community." Id. ¶ 46. As a result of Defendants' conduct, Plaintiffs allege, the Village's groundwater contains PFOA levels that far exceed the EPA's health advisory limit of 70 parts per trillion (ppt). Id. ¶¶ 29, 50–52. Groundwater tests at some sites have revealed average PFOA levels of 7,686 ppt, and one test registered 130,000 ppt. Id. ¶ 50.

The Village's municipal water supply provides drinking water to nearly 95% of its approximately 3,500 residents. Id. ¶¶ 53–55. In November 2015, the EPA recommended that Village residents no longer use the municipal water supply for drinking and cooking due to the high levels of PFOA. Id. ¶ 56. In late 2015, Saint-Gobain began providing free bottled water to Village residents, and agreed to fund the installation of a filtration system on the municipal water system to remove PFOA. Id. ¶ 58. In January 2016, New York designated the McCaffrey Street facility a state Superfund site. Id. ¶ 62.

Several area banks have indicated that they will not provide mortgage financing for homes in Hoosick Falls, and at least one bank official publically stated that his bank would not issue any mortgages for any home connected to the municipal water supply. Id. ¶ 63. As a result of the contamination and the lack of available financing, property values in Hoosick Falls have declined dramatically. Id. ¶ 66. Plaintiffs further allege that "the economic development of the Village has largely ceased," id. ¶ 67, and "people are reluctant to undertake property development," id. ¶ 71.

Bacon formed RM in 1985. Id. ¶ 75. The company, located in the neighboring town of Hoosick, id. ¶ 76, primarily provides "home construction and home improvement" services, id. ¶ 79. It also performs a variety of related construction and property improvement services, including excavations, soil and fill services, and roadway development. Id. ¶ 81. By 2015, RM was "the leading construction company in an approximately 25-mile radius of Hoosick Falls" and "essentially[] performed all excavation and roadway development work for all new commercial construction in the area between 2010 and 2015." Id. ¶¶ 86–87.

The discovery of PFOA contamination in Hoosick Falls had a profound impact on RM's business. Id. ¶ 90. The decline in property values, groundwater contamination, and lack of available financing caused nearly all home construction and improvement work to cease in 2016. Id. ¶ 90–105. RM "had no construction or excavation work scheduled at the start of July 2016," id. ¶ 102, and "no new contracts for 2016," id. ¶ 105. Its shrinking payroll reflects the economic downturn. From 2010 to 2016, RM had seven employees. Id. ¶ 101. By June 2016, the company had only one part-time and three full-time employees. Id. By September 2016, Bacon was RM's sole remaining employee, and he received no salary for his work. Id. ¶ 107. The company "experienced a substantial loss of revenue for the 2016 fiscal year." Id. ¶ 111. "Individuals have expressly stated that the presence of PFOA in the environment prevents them from hiring" RM. Id. ¶ 109.

Bacon owns the Hoosick property on which RM operates. Id. ¶ 112. He attempted to sell the property in 2016, listing it at $100,000 below its 2015 assessed value. Id. ¶ 113. No one has offered to purchase, or even looked at, the property. Id. ¶ 114.

### B.  Procedural Background

RM commenced this action on April 19, 2017. Dkt. No. 1 ("Complaint"). Defendants

initially moved to dismiss the Complaint on June 20, 2017. Dkt. No. 9 ("First Motion").

Following a joint stipulation submitted on July 14, 2017, Dkt. No. 22 ("Stipulation"), the Court

allowed RM to file an amended complaint, adding Bacon as a plaintiff, Dkt. No. 23

("Amendment Order"). Plaintiffs filed the Amended Complaint on July 25, 2017, thus mooting

the First Motion. Am. Compl.

In the Amended Complaint, Plaintiffs allege claims for tortious interference with business

relations, negligence, and negligence per se. Am. Compl. ¶¶ 117–85. Defendants moved to

dismiss the Amended Complaint for failure to state a claim on August 3, 2017. Mot. Plaintiffs

opposed the Motion, Dkt. No. 28 ("Opposition"), and Defendants submitted a reply, Dkt. No. 33

("Reply").

## III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as

true the factual allegations contained in a complaint and draw all inferences in favor of the

plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however,

requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of

[the alleged misconduct]." Twombly, 550 U.S. at 556.

5

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

## IV.   DISCUSSION

Plaintiffs allege five causes of action against Defendants: negligent interference with prospective economic advantage, Am. Compl. ¶¶ 117–31, intentional interference with economic relationship, id. ¶¶ 132–47, tortious interference with business relationship, id. ¶¶ 148–56, negligence, id. ¶¶ 157–70, and negligence per se, id. ¶¶ 171–85.The first three claims are brought by RM alone, while both Plaintiffs allege claims for negligence and negligence per se.[1]

### A.  Negligent Interference Claim (Count I)

RM's first enumerated claim is negligent interference with prospective economic advantage. Am. Compl. ¶¶ 117–31. In support of this claim, RM alleges that Defendants' negligent "contamination of the environment has disrupted [its] economic relationships with existing and future customers in the local community," id. ¶ 128, and caused it to suffer "substantial economic losses in 2016 and beyond," id. ¶ 129. Defendants' "wrongful conduct," RM claims, "constitutes the primary, if not sole, cause of the harm that [it] incurred." Id. ¶ 130.

---

[1]  Plaintiffs have voluntarily withdrawn their negligence per se claim, Opp'n at 5 n.3, and so that claim is dismissed.

As Defendants correctly note, Mem. at 4, "[t]here is no claim for negligent interference with prospective economic advantage under New York law." Diario El Pais, S.L. v. The Nielsen Co., (US), No. 07-CV-11295, 2008 WL 4833012, at *7 n.11 (S.D.N.Y. Nov. 6, 2008) (citing Bishop v. Porter, No. 02-CV-9542, 2003 WL 21032011, at *12 (S.D.N.Y. May 8, 2003)). The Diario court's observation is well-established. See Alvord and Swift v. Stewart M. Muller Const. Co., Inc., 385 N.E.2d 1238, 1241 (N.Y. 1978) ("Intentional interference with contractual relations is, of course, recognized as a tort. But the interference must be intentional, not merely negligent." (citation omitted)); see also Norte v. Worldbusiness Capital, Inc., No. 14-CV-10143, 2015 WL 7730980, at *13 (S.D.N.Y. Nov. 24, 2015) ("[U]nder New York law, 'A claim for tortious interference with contractual relations requires intentional interference, not merely intrusion that is negligent or incident to some other lawful purpose.'" (emphasis omitted) (quoting Costanza Const. Corp. v. City of Rochester, 523 N.Y.S.2d 707, 708 (App. Div. 1987))); Bishop, 2003 WL 21032011, at *12 ("[Plaintiff's] attempts to add claims for negligent interference with contractual relations or negligent interference with economic advantage fail because neither cause of action exists." (collecting cases)).

Plaintiffs cite several cases to argue that RM has adequately pleaded a cause of action for negligent interference with prospective economic advantage. Opp'n at 16–17. But each case concerns California law and is therefore not relevant to RM's claim under New York law. See In re Aluminum Warehousing Antitrust Litig., No. 13-MD-2481, 2014 WL 4743425, at *5 (S.D.N.Y. Sept. 15, 2014) (listing elements of negligent interference with prospective economic advantage under California law), aff'd, 833 F.3d 151 (2d Cir. 2016); Crown Imports, LLC v. Superior Court, 168 Cal. Rptr. 3d 228, 235 (Cal. Ct. App. 2014) (applying California law);

7

Venhaus v. Shultz, 66 Cal. Rptr. 3d 432, 435 (Cal. Ct. App. 2007) (same); Stolz v. Wong

Commc'ns Ltd. P'ship, 31 Cal. Rptr. 2d 229, 238 (Cal. Ct. App. 1994) (same).

Plaintiffs concede that "the claim is predominantly used in California," but contend that

"it has appeared in New York actions." Opp'n at 16. While Plaintiffs are correct that other New

York plaintiffs have alleged claims for negligent interference, none of the cases they cite actually

addressed the viability of the claim. See Moore v. Allentown Village Society, Inc.,

No. 13-CV-6263, 2013 WL 4008740, at *1 (W.D.N.Y. Aug. 5, 2013) (denying a motion to

transfer and granting an extension of time in which to answer the complaint, but not addressing

plaintiff's purported negligent interference claim); Nightingale Grp., LLC v. CW Capital Mgmt.,

LLC, No. 11-CV-9293, 2012 WL 2674539 (S.D.N.Y. July 5, 2012) (declining to exercise

supplemental jurisdiction over any state law claims after dismissing the plaintiff's federal claim);

Dai Nippon Printing Co. v. Melrose Pub. Co., 113 F.R.D. 540, 543–44 (S.D.N.Y. 1986) (denying

a motion to dismiss for lack of personal jurisdiction, improper venue, and ineffective service of

process, but not addressing the viability of the plaintiff's negligent interference claim). The fact

that other plaintiffs have attempted to bring claims for negligent interference does not mean the

claim exists.

In sum, Plaintiffs have not identified a single case indicating that New York recognizes a

claim for negligent interference with prospective economic advantage, and the Court is aware of

none. Because the claim does not exist, it is dismissed.

**B. Tortious Interference Claims (Counts II and III)**

RM's next two claims also concern Defendants' alleged interference with its business

relations. Although pleaded as "Intentional Interference with Economic Relationship" and

"Tortious Interference with Business Relationship," Am. Compl. ¶¶ 132–56, Plaintiffs'

Opposition reframes Counts II and III as "interference with [RM's] prospective and existing

business relationships," Opp'n at 19. It is not entirely clear from the Amended Complaint which

claim concerns prospective versus existing business relationships. Because only Count II appears

to relate to future business, the Court construes this claim to allege interference with prospective

relationships and Count III to allege interference with existing relationships. Compare Am.

Compl. ¶ 145 ("As a result, R.M. lost existing economic relationships *and future economic*

*relationships as well* and resulting in annual losses of $750,000 or more for the foreseeable

future." (emphasis added), with id. ¶ 154 ("As a result, R.M. lost existing business relationships

resulting in substantial economic losses in 2016 and beyond.").

      In any event, the elements of a claim for tortious interference with existing or prospective

business relations under New York law largely overlap. To plead either, a plaintiff must allege:

(1) the existence of a business relationship between the plaintiff and a third party; (2) the

defendant's knowledge of the relationship; (3) the defendant's intentional and improper

interference with the relationship; and (4) damages. Albert v. Loksen, 239 F.3d 256, 274 (2d

Cir. 2001); see also Albany Molecular Research, Inc. v. Schloemer, No. 10-CV-210, 2010

WL 5168890, at *7 (N.D.N.Y. Dec. 14, 2010) (Kahn, J.) ("Under New York law, tortious

interference with business relations occurs 'where the third party would have entered into or

extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the

defendant.'" (quoting WFB Telecomms., Inc. v. NYNEX Corp., 590 N.Y.S.2d 460, 461 (App.

Div. 1992))); Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103–04 (N.Y. 2004) (discussing the

elements of a tortious interference claim); Barns & Farms Realty, LLC v. Novelli, 917

N.Y.S.2d 691, 693 (App. Div. 2011) (same). To state a claim for interference with prospective

relations, a plaintiff must also allege that the defendant employed "wrongful means" to disrupt

the plaintiff's potential business. Ullmannglass v. Oneida, Ltd., 927 N.Y.S.2d 702, 705–06 (App.

Div. 2011). In other words, "as a general rule, the defendant's conduct must amount to a crime or

an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus

insufficiently 'culpable' to create liability for interference with prospective contracts or other

nonbinding economic relations." Carvel, 818 N.E.2d at 1103.

        To survive a motion to dismiss, a plaintiff must allege that it was "actually and

wrongfully prevented from entering into or continuing in a specific business relationship." Korn

v. Princz, 641 N.Y.S.2d 283, 283 (App. Div. 1996); see also White v. Ivy, 880 N.Y.S.2d 374,

377 (App. Div. 2009) ("While New York recognizes a cause of action for tortious interference

with business relations or contractual relations, the party asserting such a claim must allege a

particular business relationship or contract with a third party that was affected by the offending

party's actions."). A plaintiff must also allege that the defendant "acted with the sole purpose of

harming the plaintiff." Nadel, 208 F.3d at 382; see also Diario, 2008 WL 4833012, at *7 (noting

that a plaintiff asserting tortious interference with prospective economic advantage must allege

that the defendant "intentionally interfered" with specific prospective business relationships).

        RM's tortious interference claims fail for two reasons. First, Plaintiffs have failed to

plausibly allege that Defendants were actually aware of the specific business relationships they

claim were disrupted. "[A]n implicit element of acting 'for the sole purpose of harming the

plaintiff' is knowledge of the prospective economic relation." GS Plasticos Limitada v. Bureau

Veritas, 931 N.Y.S.2d 567, 568 (App. Div. 2011) (citing Caprer v. Nussbaum, 825 N.Y.S.2d 55,

78 (App. Div. 2006)); see also 800America, Inc. v. Control Commerce, Inc., 202 F. Supp.

2d 288, 290 (S.D.N.Y. 2002) ("Having no knowledge of the relations between 800America and

Control Commerce until after those relations were terminated, MindArrow could not possibly

have intentionally interfered with those relations, existing or prospective."). The Amended

Complaint alleges that because RM "was the primary company in the region providing

excavation and leveling work, along with other work for property development[,] [D]efendants

knew or should have known of [its] economic relationships within the community and [its]

leading role in the region for such services." Am. Compl. ¶ 121; see also id. ¶ 136 (same). This is

precisely the kind of "generalized allegation" that does not adequately plead knowledge to

support a tortious interference claim. Yong Ki Hong v. KBS Am., Inc., 951 F. Supp. 2d 402, 423

(E.D.N.Y. 2013) ("Plaintiffs assert that 'Defendants knew or should have known the Plaintiffs

had customers who enjoyed KBS content and employed wrongful means to interfere with that

relationship.' A generalized allegation of this nature will not pass muster; plaintiffs must show

that defendants had actual knowledge of the specific business relationships with which they

allegedly interfered."); see also 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525,

546 (S.D.N.Y. 2014) (granting dismissal and rejecting plaintiffs' argument that "the defendants'

knowledge of [business] relationships can be 'inferred,' . . . [because] in order to state a claim

for tortious interference, there must be a particular business relationship between the plaintiff and

the third party, that defendants must have *actual* knowledge of that specific relationship, and that

the interference must be intentional, not negligent"). Plaintiffs' failure to plead actual knowledge

of specific business relationships is fatal to these claims.

RM's tortious interference claims also fail because the Amended Complaint does not allege that Defendants "acted with the sole purpose of harming" RM. Nadel, 208 F.3d at 382; see also Diario, 2008 WL 4833012, at *7 (noting that intentional interference is an essential element of an interference with prospective economic claim); 800America, 202 F. Supp. 2d at 289 ("Both these torts require intentional interference."). Indeed, it is not enough simply to allege intentional interference. Interference must be the defendant's sole objective. See MVB Collision, Inc. v. Progressive Ins. Co., 13 N.Y.S.3d 139, 140 (App. Div. 2015) (affirming dismissal of a tortious interference claim where the defendant's "conduct was, at least in part, to advance its own interests, not solely for the purpose of harming the plaintiff"); Besicorp Ltd. v. Kahn, 736 N.Y.S.2d 708, 711–12 (App. Div. 2002) (affirming dismissal of a prospective business claim because "[r]ather than alleging that defendants' conduct was motivated solely by malice or a desire to inflict injury by unlawful or wrongful means as required, plaintiff alleges that defendants were motivated by their desire to maximize their financial gain" (emphasis omitted)).

The Amended Complaint does not allege facts to support a plausible inference that Defendants released PFOA into Hoosick Falls's aquifer in order to harm RM's business relationships. Perhaps because this inference is so patently implausible, Plaintiffs essentially concede that they have not alleged intent. See Opp'n at 21 n.6 ("[A]bsent a vindictiveness that [P]laintiffs are unaware of, [P]laintiffs cannot allege that [D]efendants worked diligently and deliberately to sabotage and undermine R.M.'s existing contracts with various local businesses. . . . [D]efendants have no financial or business reason to crush [RM's] operations."). RM also "acknowledges that its claim of [tortious interference] pushes the envelope; but only to the extent that a *mens rea* of 'intentional' conduct differs from that of 'reckless' conduct." Id.

12

at 20–21. But intent and recklessness do differ, and RM's failure to plead "only" one element of a claim means it has not pleaded the claim. Inferring that Defendants contaminated the Village's groundwater in order to disrupt RM's business does not merely "push the envelope," it is entirely implausible. Therefore, the tortious interference claims are dismissed.

### C. Negligence (Count IV)

In their fourth and final remaining claim, Plaintiffs allege a cause of action for negligence. Am. Compl. ¶¶ 157–70. "The well-known elements of negligence under New York law are duty, breach, causation, and injury." Benoit v. Saint-Gobain Performance Plastics Corp., No. 16-CV-930, 2017 WL 4331032, at *6 (N.D.N.Y. Aug. 16, 2017) (Kahn, J.) (citing Aegis Ins. Servs., Inc. v. 7 World Trade Co., 737 F.3d 166, 177 (2d Cir. 2013); accord Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 490 (N.Y. 2016)). Plaintiffs target the same underlying tortious conduct, but allege different theories of injury.

According to the Amended Complaint, Defendants owed Plaintiffs duties to prevent the discharge of PFOA into the environment and to ensure that their manufacturing practices did not unreasonably endanger the Village's drinking water supply. Am. Compl. ¶¶ 162–63. Defendants allegedly breached these duties "by unreasonably disposing of PFOA in a manner that guaranteed that PFOA would enter the environment, including the groundwater." Id. ¶ 165. RM contends that by contaminating the Village's groundwater, Defendants wreaked havoc on the local housing market and destroyed its business. Id. ¶¶ 166–68. Bacon alleges injury to his property, which has been contaminated with PFOA. Id. ¶¶ 44, 169. Defendants advance several reasons to reject Plaintiffs' claims. Mem. at 10–13.

The Court considers Plaintiffs' negligence claims in turn below.

13

### 1. RM's Negligence Claim

RM alleges that Defendants' breach "caused economic conditions to collapse in Hoosick Falls and a resulting collapse in [its] business operations." Am. Compl. ¶ 166. Consequently, "no property development occurred in the Village during 2016," id., and RM "has lost revenue of approximately $1,000,000 for 2016, as well as the ownership of equipment," id. ¶ 168. Defendants argue that RM fails to state a cognizable claim for negligence under New York law because it "alleges a loss of business revenues based on economic conditions of Hoosick Falls at large, as opposed to any damage PFOA caused to the Property on which it operates." Mem. at 12. Allowing RM's claims to proceed, Defendants argue, would permit precisely the kind of limitless liability foreclosed under New York law. Id.

Both parties rely heavily on the New York Court of Appeals's decision in 532 Madison Avenue Gourmet Foods, Inc v. Finlandia Ctr., Inc., 750 N.E.2d 1097 (N.Y. 2001). In that case, shopkeepers and business owners in midtown Manhattan sued after construction collapses blocked access to their buildings. Id. at 1099–1100. The issue was whether the plaintiffs, whose property was not itself damaged by the collapses, could state a claim for negligence in an attempt to recover for lost business and other economic damages. Id. at 1100–01. The New York Court of Appeals found that they could not, and limited recovery to those plaintiffs who "suffered personal injury or property damage" as opposed to those who suffered only a reduction in profits. Id. at 1103.

In Baker v. Saint-Gobain Performance Plastics Corp., 232 F. Supp. 3d 233 (N.D.N.Y. 2017) (Kahn, J.), a case that also involves PFOA contamination in Hoosick Falls, the Court explained that 532 Madison "concerned the existence of a legal duty between the plaintiffs and

defendants." Id. at 245 (citing 532 Madison, 750 N.E.2d at 1101). The 532 Madison court

recognized that "[a] landowner who engages in activities that may cause injury to persons on

adjoining premises surely owes those persons a duty to take reasonable precautions to avoid

injuring them," but concluded that the expansion of this duty to protect additional shopkeepers

who lost profits due to road closures—shopkeepers whose properties were not themselves

reached by the collapse—would unreasonably expand the scope of negligence. 750 N.E.2d

at 1102–03. In so doing, the court limited the scope of tortfeasors' duty. Plaintiffs argue that

Defendants' duty to avoid polluting the groundwater of Hoosick Falls extends to businesses who

suffered economic loss as result of the PFOA contamination. Opp'n at 9–11. To the extent those

businesses are within the zone of contamination, the Court agrees.

  In 532 Madison, the Court of Appeals described how a court should assess a tortfeasor's

duty:

> The existence and scope of a tortfeasor's duty is, of course, a legal
> question for the courts, which "fix the duty point by balancing factors,
> including the reasonable expectations of parties and society generally,
> the proliferation of claims, the likelihood of unlimited or insurer-like
> liability, disproportionate risk and reparation allocation, and public
> policies affecting the expansion or limitation of new channels of
> liability."

750 N.E.2d at 1101 (quoting Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1060

(N.Y. 2001)). Such a duty "do[es] *not* rise from mere foreseeability of the harm," Hamilton, 750

N.E.2d at 1062 (citing Pulka v. Edelman, 358 N.E.2d 1019, 1022–23 (N.Y. 1976)), but instead

comes from an analysis "of the wrongfulness of a defendant's action or inaction" combined with

"an examination of an injured person's reasonable expectation of the care owed," Palka v.

Servicemaster Mgmt. Servs. Corp., 634 N.E.2d 189, 192 (N.Y. 1994) (citing Turcotte v. Fell,

502 N.E.2d 964, 967 (N.Y. 1986)). "At its foundation, the common law of torts is a means of apportioning risks and allocating the burden of loss." 532 Madison, 750 N.E.2d at 1101.

The Court concluded in Baker that "this policy determination must include a duty not to pollute a plaintiff's drinking water. Society has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply." 232 F. Supp. 3d at 245 (collecting cases). "It is sensible public policy to require that manufacturers avoid polluting the drinking water of the surrounding community, and nothing in 532 Madison prevents a person whose water supply was contaminated by such conduct from recovering in tort, even if she seeks economic damages." Id. at 245–46.

The 532 Madison court limited the defendants' duty to those plaintiffs who were physically impacted by the collapse in order "to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act." 750 N.E.2d at 1101. Central to the court's decision was the fact that there were "thousands" of potential claimants, representing "an indeterminate group in the affected areas thus may have provable financial losses directly traceable to the two construction-related collapses, with no satisfactory way geographically to distinguish among those who have suffered purely economic losses." Id. at 1103. Those concerns are not present here because there is a reasonable method to "geographically . . . distinguish among those who have suffered purely economic losses." Id. Unlike the plaintiffs in 532 Madison, who were outside the immediate collapse area, RM operates within the contamination zone; PFOA has spread from the McCaffrey Street facility to the property on which it operates. Am. Compl. ¶ 44. Consequently, while the shopkeepers in 532 Madison were only indirectly impacted by the defendants' conduct, RM has been directly

16

impacted by the contamination. The Court has already held that Defendants owe a duty not to pollute the Village aquifer because "[s]ociety has a reasonable expectation that manufacturers avoid contaminating the surrounding environment." Baker, 232 F. Supp. 3d at 245. That same reasonable expectation leads the Court to conclude that Defendants have a duty to those businesses within the zone of contamination that have suffered economic losses traceable to Defendants' breach.

The wrongfulness of Defendants' acts—failing to properly dispose of industrial waste over many years—and the severity of harm RM has suffered—the near total collapse of its business—further support concluding that Defendants owe a duty to businesses within the contamination zone. See Palka, 634 N.E.2d at 192 (discussing factors to consider when assessing the existence of legal duty). Moreover, allowing RM's negligence claim to proceed will not open Defendants to "limitless exposure to potential suits," 532 Madison, 750 N.E.2d at 1102, because there are a finite number of potential plaintiffs in the contamination zone. The fact that Defendants have not faced a torrent of claims from businesses in Hoosick Falls seeking lost profits undercuts their arguments to the contrary.

For these reasons, the Court concludes that Defendants owe a duty to businesses within the zone of contamination that suffered economic loss as result of the PFOA contamination. Therefore, the Motion is denied with respect to RM's negligence claim.

### 2. Bacon's Negligence Claim

Bacon alleges that Defendants' breach caused PFOA to contaminate his property, diminishing its value. Am. Compl. ¶¶ 44, 169. Defendants argue that Bacon's claim should be dismissed because he "can point to no property damage to support his negligence claims." Mem.

17

at 12. According to Defendants, the mere fact that Bacon's property has been contaminated with PFOA, without more, does not constitute "physical damage to the Property" and thus his "alleged loss of property value is 'a purely economic loss,'" not recognized under New York law. Id. at 12–13 (quoting Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC, No. 13-CV-4358, 2014 WL 2169769, at *6 (E.D.N.Y. May 23, 2014)).

Unlike the plaintiffs in Baker and Benoit, Bacon does not allege that his property has been deprived of potable water. In some respects, his injury is more straight-forward: Defendants mishandled PFOA at the McCaffrey Street facility, causing it to spread and contaminate his property. E.g., Am. Compl. ¶¶ 43–44. This is a classic contamination case, and a well-established theory of negligence under New York law. See, e.g., Ivory, 983 N.Y.S.2d at 114–15, 117 (affirming denial of a motion to dismiss negligence claims based on "contaminated groundwater entering the property and soil owned by [plaintiffs]"); Murphy v. Both, 922 N.Y.S.2d 483, 484–85 (App. Div. 2011) (affirming denial of summary judgment on negligence claims based on contamination caused by defendant's underground fuel tank). As these cases show, Defendants had a duty under New York law to take reasonable steps to prevent PFOA from entering Bacon's property. The contamination resulting from their alleged breach is clearly an injury to his property.

Defendants also argue that Bacon's claim should be dismissed because he has not alleged precisely how much PFOA is on his property. Mem. at 12. This demands too much at the pleading stage, where Bacon need only provide "a short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. P. 8(a)(2). Defendants cite no case to support their apparent belief that a plaintiff must plead a specific level of contamination to avoid dismissal.

18

The fact that the Baker plaintiffs alleged specific levels of well contamination, Mem. at 12 n.6, does not mean Bacon must do the same in order to state a plausible claim. As the cases discussed above make clear, Bacon need only allege that his property has been contaminated. The level of contamination and any impact on his property value is an issue for discovery and trial.

Moreover, the Court notes that even if public fear of PFOA is unfounded, Bacon may still allege property damages so long as the decline in market value is real. See Criscuola v. Power Auth. of State of New York, 621 N.E.2d 1195, 1197 (N.Y. 1993) ("[W]hile a personal or quirky fear or perception is not proof enough, the public's or the market's relatively more prevalent perception should suffice, scientific certitude or reasonableness notwithstanding."); Cottonaro v. Southtowns Indus., Inc., 625 N.Y.S.2d 773, 774 (App. Div. 1995) ("Damages from the diminished market value of real property as a result of public fear of exposure to a potential health hazard constitute consequential damages." (citing Criscuola, 621 N.E.2d at 1197)); see also Scribner v. Summers, 138 F.3d 471, 473 (2d Cir. 1998) ("Criscuola held that a land owner in a condemnation proceeding may recover the decrease in value due to the public's fear of something on the land . . . even if the fear is unreasonable."). In other words, if people do not want to purchase Bacon's property because it has been contaminated with PFOA, he has stated a claim for negligence.[2]

Because he has adequately pleaded property damage, Bacon's negligence claim survives Defendants' Motion.

---

[2] To the extent RM alleges its soil and fill business has been harmed because of public perception that its fill is contaminated, Am. Compl. ¶ 97, its negligence claim still fails. RM does not claim that its fill has actually been contaminated, and appears to allege that it was not. See id. ("People suddenly became distrustful of even the fill that [RM] provided, though it came from a different area, as they anticipated that the fill might contain PFOA.").

### D.  Interlocutory Appeal

28 U.S.C. § 1292 allows the district court, when issuing an otherwise unappealable order, to permit an interlocutory appeal to the appropriate circuit court. Specifically, § 1292(b) states that, when a district judge is "of the opinion that [an interlocutory] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." When a denial of a motion to dismiss (or, as in this case, a grant in part and denial in part) "'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'" Balintulo v. Daimler AG, 727 F.3d 174, 186 (2d Cir. 2013) (quoting Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 111 (2009)).

The Court certified an interlocutory appeal under § 1292 in Baker and Benoit, which involved similar questions of New York law. Baker, 232 F. Supp. 3d at 256; Benoit, 2017 WL 4331032, at *13. In those cases, the Court explained:

> In this case, where the question of which claims are viable under New York law could significantly impact the classes to be certified, the scope and focus of discovery, any subsequent motion for summary judgment, and the issues to be presented at trial, an early resolution of the applicable law could significantly improve the efficiency of this litigation and reduce its cost for both Defendants and the putative classes. Furthermore, an interlocutory appeal could benefit either or both parties, since both sides incurred a partially adverse decision through this Memorandum-Decision and Order.

Baker, 232 F. Supp. 3d at 256; Benoit, 2017 WL 4331032, at *13. For the same reasons, the requirements of § 1292 are met in this case.

Therefore, the Court certifies this order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Any party seeking to appeal pursuant to this certification must apply to the Second Circuit for leave to appeal within ten days of the filing date of this Memorandum-Decision and Order, and any such appeal will not delay proceedings in this Court absent a stay granted by the Court of Appeals. § 1292(b).

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 26) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that RM's claims for negligent interference with prospective economic advantage, tortious interference with prospective and existing business relationships, and negligence per se are **DISMISSED with prejudice**; and it is further

**ORDERED**, that Bacon's negligence per se claim is **DISMISSED with prejudice**; and it is further

**ORDERED**, that RM and Bacon's negligence claims survive Defendants' Motion; and it is further

**ORDERED**, that the questions of law decided in this Memorandum-Decision and Order are certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and any party may apply for leave to appeal with the United States Court of Appeals for the Second Circuit within **ten days** of the filing date of this Memorandum-Decision and Order;[3] and it is further

---

[3] See also Fed. R. App. P. 5 (providing rules governing petitions for permission to appeal).

21

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties pursuant to the Local Rules.

**IT IS SO ORDERED.**

DATED:          February 20, 2018
                Albany, New York

Lawrence E. Kahn
U.S. District Judge